ANNIE BRYANT, as Executrix, etc., of WILLIAM E. BRYANT, Deceased, Respondent, *v.* JACOB A. ONDRAK, Appellant, Impleaded with Others.

87h 477
56ad503

*Oral agreement — not binding, when it is to be embodied in a written one.*

The fact, that parties negotiating for the purchase and sale of personal property decide to have a formal written agreement executed, is strong evidence that the prior oral agreement was not understood or intended to be binding.

APPEAL by the defendant, Jacob A. Ondrak, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 12th day of November, 1894, upon the verdict of a jury rendered after a trial at the New York Circuit, and also from an order entered in said clerk's office on the 12th day of November, 1894, denying the defendant's motion for a new trial made upon the minutes.

*Charles M. Demond*, for the appellant.

*Albert H. Atterbury*, for the respondent.

PARKER, J. :

We shall only discuss one of the several questions brought to our attention by the appellant, because the conclusion we have reached in respect to it calls for a reversal of the judgment.

We think the plaintiff failed to establish the contract upon which recovery was sought, and, therefore, the defendant's motion to dismiss the complaint should have been granted. The preliminary facts, essential to an understanding of the situation which led up to

the meeting of the parties, which the plaintiff alleges resulted in the making of the agreement sued on, are as follows:

Prior to February 25, 1894, the defendant Jacob A. Ondrak and the plaintiff's testator, William E. Bryant, were partners in business as ladies' tailors at No. 314 Fifth avenue, New York city. They had a written partnership agreement which provided that in the event of the death of either partner the survivor might carry on the business for six months succeeding the first of January or July next ensuing and have two months thereafter to close up the business. On the date above named William E. Bryant died, leaving him surviving a widow, this plaintiff, and six adult children who were joined as defendants. By his will he gave all of his property to his widow, whom he appointed executrix.

The will was not proved until April 23, 1894, letters testamentary thereon being issued to the plaintiff on the day following. About a week after the death of Bryant, Ondrak told Miss Kate Bryant, a daughter of the deceased, and who had been for a long time in the employ of the firm, that he would purchase her father's interest in the business forthwith and suggested an appraisal to that end. Over a month before the will was proved, and without any knowledge on the part of Mr. Ondrak of its contents, and on March 13, 1894, Mr. Ondrak with his appraiser, John S. Wetherley, and his lawyer, Charles S. Hayes, met Miss Bryant, representing her mother, the plaintiff, and her brothers and sisters, together with her appraiser, Jonas H. Monheimer, and her lawyer, Boudinot Keith, at the store. The fixtures, stock, book accounts and good will were appraised separately, and after a discussion of several hours, in which all of the parties present, including the appraisers and lawyers, took part, the terms of the agreement were, as the parties seem to have supposed arrived at, by which Ondrak was to pay $11,000 for the interest of his deceased partner, including the good will of the business. The agreement was to be reduced to writing, and the fixtures, stock, book accounts and good will to be assured to him by the execution of the agreement by the widow and six children. After discussing the various questions which were presented and arriving, as the parties supposed, at the terms of the agreement, one or both of the lawyers were instructed to prepare a written contract for execution. For some reason the contract was not at once pre-

pared, and the day following Miss Bryant called upon the defendant and informed him that they were in need of ready money for the payment of funeral and other expenses and so he advanced to her the sum of $2,500. Ondrak's lawyer, who insists that it was the understanding that he was to prepare the contract, a few days after the meeting of the parties prepared and sent to Mr. Keith, the attorney for the Bryants, a proposed agreement to be signed by Mrs. Bryant and the children. It was not acceptable and the Bryants refused to sign it, asserting that it embraced matters not included in the oral arrangement, although it appears from the testimony of Ondrak and his lawyer to have been actually in conformity therewith as they understood it. Mr. Keith then submitted a proposed agreement to be signed by Mrs. Bryant, and a supplemental agreement to be signed by the children as an estoppel, but they were never signed, and Miss Bryant, who alone represented the Bryants' interest on the thirteenth of March, upon her examination in relation to said contracts, was asked this question, "But you were not willing that you and your brothers and sisters should sign the agreement that your counsel had prepared ?" To which she replied, "No; not to sign any agreement." Ondrak's lawyer subsequently proposed a modification of the proposed agreement prepared by Mr. Keith, and also made some changes in the draft of the one which he had submitted, but neither of them proved acceptable to Miss Bryant, and the attempt to prepare a written contract which should meet with the approval of all the parties was then abandoned by both lawyers. The main point of difference between the parties seems to have related to the manner by which the good will which it was conceded Ondrak was to have and was to pay for, should be assured to him. But the negotiations did not stop with the failure to agree upon a writing which should express the understanding of the parties. Mr. Atterbury, who had formerly been the attorney for the Bryants, on his return from Europe early in April following, undertook to adjust the difficulties between the parties. As he testifies, he attempted to bring about some compromise, and for that purpose met Miss Bryant and Mr. Ondrak with his counsel, Mr. Hayes. In the course of this interview Mr. Atterbury suggested tentatively, as he expresses it, a new appraisement, conveying at the same time an intimation that, as a result of it, Mr.

Ondrak might be obliged to pay more money. He also intimated that it might be proper to have a receiver appointed as a last resort, although one of the things that he was most anxious to avoid. On another occasion Ondrak was asked by Miss Bryant's counsel, in her behalf, what he would take to sell out. Without further detailing the various conversations between the parties and the attempts to adjust matters in controversy, it is sufficient for present purposes to say, that they continued all through the month of April. But about the first of May plaintiff's counsel apparently reached the conclusion that, notwithstanding it was a part of the original arrangement that the terms of the agreement should be reduced to writing and signed by all of the Bryants, the failure of the Bryants to execute an agreement embodying its terms even as they claimed to have understood them to be, and the various other negotiations and propositions looking to a settlement and adjustment of the differences between the parties, they could treat the conversations between the parties, of March thirteenth, as resulting in a completed contract and recover the price agreed on. If it were a completed contract the position taken was correct. But it seems to us very clear that the contract was not completed. That as a matter of fact the minds of the parties never met upon the terms of the agreement. This appears from the dispute which the parties had over the terms of the proposed written contracts, to which we have already paid sufficient attention. There is other and conclusive evidence that the minds of the parties did not meet, either as to the nature of the agreement affecting the transfer of the good will of the business to Ondrak, or as to the persons who were to be parties to it. But to that we shall refer later. Did the parties to this alleged oral agreement understand that the contract was so far completed that nothing more needed to be done in the premises? It would seem not for several reasons.

(1) They provided that a written agreement should be prepared and executed. The authorities have always recognized, that the circumstance that the parties decided to have a formal written agreement, is strong evidence that the oral agreement was not understood or intended to be binding. (1 Whart. on Cont. § 5; Pollock on Cont. [3d ed.] 41; *Brown* v. *N. Y. C. R. R. Co.*, 44 N. Y. 79–86.)

(2) Again, Ondrak was attempting to make an arrangement with

all the Bryants, and this could only be accomplished by having them parties to an agreement in some form. They were not present, and Miss Bryant neither produced nor pretended to have any written authority to act for them, and under such circumstances it is hardly to be presumed that his attorney would advise that he would be sufficiently protected as against all of them by her assurances.

That Ondrak understood that he was to have the agreement of all the Bryants, not of the plaintiff alone, is evidenced not only by the fact that he did not have knowledge of the contents of the will, but by his conduct and language and that of his counsel at the time of the negotiations. The testimony of Keith, the counsel for the Bryants on that occasion, sufficiently establishes that fact.

He said : " I think Mr. Hayes (Ondrak's counsel) said, I hand you this dollar on behalf of Mr. Ondrak as representing yourself, your brothers, your sisters and your mother — to you on behalf of your mother and brothers and sisters." It was not pretended at that time, nor was it on the trial, that Miss Bryant had been authorized by her mother or her brothers and sisters to sign for them any contract to which she and Ondrak might agree.

Necessarily, therefore, it could not have been intended that Ondrak should be bound before the other parties, which was intended to be provided for by the execution of the agreement which all understood was to be prepared by one or both of the lawyers.

. (3) The minds of the parties did not meet. This not only appears from their subsequent conduct over the several proposed agreements, and the efforts for compromise on other lines than that expressed in the writings prepared by the attorneys, but it appears from the testimony of the parties. The testimony of Ondrak and his counsel, Hayes, shows that they understood that the agreement which Ondrak was to have was not to be from Mrs. Bryant, but from her and all of the children.

From Ondrak's standpoint there were two reasons for it : *First,* he had no knowledge of the disposition which Bryant had made of the property ; and, *second,* two of the Bryant children were experts in the business, and one of them had been for a long time employed in the store under the name of Miss Williams. He was desirous, therefore, of securing such an agreement as would cover

all the Bryants' interest in the first place, and in the second to assure to him the good will of the business beyond doubt. This he may well have supposed might not be fully accomplished, if two experts in the business by the name of Bryant should be in no way obligated to him. Not only is the appellant's testimony corroborated by his counsel, and by the reasons we have suggested, but it is fully supported by the testimony of Keith, counsel for the Bryants, in the quotation which we have already taken from his testimony, which purports to give what Mr. Hayes said to Miss Bryant when he handed her the dollar.

But Miss Bryant testifies that the understanding was not that all of her brothers and sisters, as well as her mother, were to sign the agreement, but that they were to sign a writing consenting that their mother should sign the agreement with Ondrak. It may well be that that was her understanding of the terms of the agreement, but it certainly was not the understanding of the other parties. The difference between them was substantially as we have observed, and it operated to prevent them from uniting in the written agreement, which all of the parties understood should contain a full and complete expression of the terms and conditions of their arrangement. Other facts might be cited in support of the position we have taken, but we think enough has been said to make it reasonably clear that the defendant Ondrak was entitled to a dismissal of the complaint upon the ground that the plaintiff had not established the contract alleged in her complaint.

The judgment should be reversed and a new trial granted, with costs to the appellant to abide the event.

Van Brunt, P. J., and O'Brien, J., concurred.

Judgment reversed, new trial granted, costs to appellant to abide event.